UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GERALDINE IMOYA MONROQUE,

Plaintiff,

-v-

LIONS GATE TELEVISION INC.,

Defendant.

23-CV-07017 (JAV)

OPINION AND ORDER

JEANNETTE A. VARGAS, United States District Judge:

*Pro se* Plaintiff Geraldine Imoya Monroque ("Plaintiff") brings this action against Lions Gate Television, Inc. ("Lions Gate") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). ECF No. 22 ("Amended Complaint" or "Am. Compl."). Defendant now moves for summary judgment. ECF No. 62. Plaintiff opposes the motion for summary judgment and moves to preclude the testimony of Defendant's expert witness. ECF Nos. 69-71. For the reasons that follow, the motion to preclude is **DENIED** and the motion for summary judgment is **GRANTED**.

## BACKGROUND

The facts on this summary judgment motion are largely undisputed.[1]

---

1 Pursuant to Rule 56.1 of the S.D.N.Y. Local Rules of Civil Procedure, Defendant submitted a Statement of Undisputed Material Facts. ECF No. 67 ("Def. 56.1 Stmt."). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*,

### A. Lions Gate's COVID-19 Vaccination Policy

This case has its origins in the COVID-19 pandemic. As has been recounted in numerous other cases considering challenges to vaccine mandates, on January 31, 2020, the United States declared a public-health emergency due to the rise of COVID-19 cases. Def. 56.1 Stmt., ¶ 4. In December 2020, the U.S. Food and Drug Administration ("FDA") issued an emergency use authorization allowing individuals ages 16 and older to receive COVID vaccines from Pfizer and Moderna. *Id.*, ¶ 9. During the relevant time period, state, federal, and local public health officials consistently recommended that adults be vaccinated against COVID-19 to stop its spread and combat its most serious effects. *Id.*, ¶ 15. The CDC continued to recommend vaccination for all eligible individuals, including booster doses, throughout 2023. *Id.*, ¶ 20.

In July 2021, Lions Gate and several other production companies entered into a Return to Work Agreement ("RTWA") with the Screen Actors and Television

---

258 F.3d 62, 74 (2d Cir. 2001). The rule demands that "any motion for summary judgment . . . be accompanied by a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). Any statements of material facts set forth by the moving party "will be deemed to be admitted for purposes of the motion unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civ. R. 56.1(c).

Plaintiff did not submit a separate document responding to Defendant's Local Rule 56.1 Statement, but in her opposition brief, ECF No. 70 ("Pl. Opp."), she did controvert, to varying degrees, statements contained in paragraphs 1, 9, 13, 27, 44, 56, 65, 74, and 79 of Defendant's Local Rule 56.1 statement. *See* Pl. Opp. at 3. The Court will construe Plaintiff's opposition brief as the response required by Local Rule 56.1(c), and deems the remaining paragraphs of Defendant's Local Rule 56.1 Statement to be admitted.

Guild ("SAG/AFTRA") and other affected unions. *Id.*, ¶ 27; *see also* ECF No. 64-2 ("RTWA"). The RTWA provided that studios could mandate COVID-19 vaccination for individuals working in Zone A of a production as a condition of employment, "subject to reasonable accommodations as required by law for individuals who cannot be vaccinated due to disability or a sincerely held religious belief, practice or observance." Def. 56.1 Stmt., ¶ 34; *see also* RTWA at 48. Zone A was defined to include "all performers and background actors working on set." Def. 56.1 Stmt., ¶ 30; *see also* RTWA at 50.

Pursuant to the RTWA, Lions Gate adopted a policy of requiring all Zone A cast and crew to be fully vaccinated for COVID-19. Def. 56.1 Stmt., ¶ 35. Lions Gate's vaccination policy permitted any cast or crew member "to request an accommodation due to a medical reason or sincerely held religious belief." *Id.*, ¶ 36.

**B. Plaintiff's Accommodation Request**

Plaintiff has worked in the entertainment industry as a film and television actress and has been a union member of SAG/AFTRA since 2002. *Id.*, ¶ 2. On February 2, 2023, Plaintiff was contacted by Central Casting, on behalf of Lions Gate, to inquire whether she was available to perform as a background actor on an episode of *Raising Kanan*. *Id.*, ¶ 38; *see also* ECF No. 64-5. In that email, Central Casting informed Plaintiff that *Raising Kanan* "has a mandatory vaccination policy for all Zone A workers, including Background Actors, Stand-in, and other talent ages 6 months and above working on its set." ECF No. 64-5 at 1. The email noted that to be eligible to participate in the production, an employee must be "(1) either

(a) fully vaccinated with the COVID-19 vaccine AND received a "Booster" if you are eligible. . . or (b) fully vaccinated with the COVID-19 vaccine but not yet Booster-eligible; or (2) have a medical disability or sincerely-held religious belief that prevents vaccination." *Id.*

Plaintiff emailed Brian Padilla, Vice President of Lions Gate's Human Resources Business Partners division, to inquire about an exemption from the vaccination policy. Def. 56.1 Stmt., ¶ 43; *see* ECF 65-1 at 6. Plaintiff indicated that she is "medically unable to receive this vaccination as [she is] prone to relapsing autoimmune condition" and attached screen captures of her thyroid TSH history from 2007 to 2022. ECF 65-1 at 2-6. She also asserted that her "religious faith prohibits [her] from participating in experimental testing of gene therapies made of certain known and unknown products and chemical compounds and genetic materials." *Id.* at 6.

Mr. Padilla sent Plaintiff a copy of a religious accommodation form to complete herself and a medical accommodation form to be completed by her medical provider. Def. 56.1 Stmt., ¶ 46; *see* ECF 65-1 at 4-5. Plaintiff ultimately did not submit a medical accommodation form or any medical documentation completed by a medical provider. Def. 56.1 Stmt., ¶ 47. She did, however, submit a completed religious accommodation form. Def. 56.1 Stmt., ¶ 49; ECF 65-2 at 3-4. In the form, she stated that she was a Christian and cited the Bible verse 1 Corinthians 6:19, describing her body as a "temple of the Holy Spirit." ECF 65-2 at 4. She indicated that her decision not to vaccinate was "based on [her] deeply held religious beliefs."

*Id*. Plaintiff additionally noted that she is "enrolled in an international SARS COV 2 Control Group which further prohibits [her] from submitting or [being] coerced into receiving the COVID vaccine gene therapy." *Id*. at 2. Plaintiff requested an accommodation of either "vaccination exemption" or "[d]iscontinuation of the Mandate and RTWA." *Id*. at 3.

On February 3, 2023, Mr. Padilla informed Plaintiff that the "essential functions of [her] job as a Background Actor require [her] to work without the use of a face covering/mask and to be in and work in Zone A," therefore "[Lions Gate] was unable to provide [her] with a reasonable accommodation at this time." Def. 56.1 Stmt., ¶ 53; *see* ECF No. 65-3 at 1. On February 8, 2023, Plaintiff appealed this determination, claiming that the decision was "discriminatory and arbitrary" and that it denied Plaintiff a "religious or medical exemption in violation of [her] right to work without discrimination." *See* ECF No. 65-4 at 1.

Mr. Padilla responded that Plaintiffs' "request for a religious accommodation pertaining to the production's vaccination policy was carefully reviewed and considered" and that Lions Gate was "unable to provide [Plaintiff] with a reasonable accommodation at this time" because "allowing Zone A cast who are not vaccinated to report to the workplace and to work without the use of a mask during filming [] poses a serious and irresponsible risk to the safety and well-being of cast and crew and presents an undue hardship to the production." Def. 56.1 Stmt., ¶ 55; *see* ECF No. 65-5 at 1.

Because of her unvaccinated status, Lions Gate released Plaintiff from the

role on *Raising Canan*. Def. 56.1 Stmt., ¶ 42.

## LEGAL STANDARDS

A grant of summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a reasonable jury could render a verdict in favor of the nonmoving party, a genuine dispute of material fact exists. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (citation omitted). The moving party has the burden of demonstrating the absence of a question of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In forming this assessment, the Court must view all facts "in the light most favorable" to the non-moving party. *See Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). "Where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied." *Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir. 2003) (cleaned up).

The Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). Ultimately, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

DISCUSSION

## A. Admissibility of Expert Opinion Evidence

Lions Gate has submitted evidence from its expert witness, Dr. Angela Perez, in support of its motion for summary judgment. Defendant offers Dr. Perez as an expert in the field of COVID-19 safety protocols. The Court first addresses the admissibility of this proposed expert testimony, as such evidence may affect the pending summary judgment motion.

### 1. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based

> on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Trial courts serve an important role as "gatekeepers" under Rule 702, responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

"In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it 'has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (cleaned up).

"[I]n addition to the indicia of reliability identified in Rule 702, a trial court may consider the criteria enumerated in *Daubert*." *In re Acetaminophen – ASD-ADHD Prod. Liab. Litig.*, 707 F. Supp. 3d 309, 335 (S.D.N.Y. 2023) (citation omitted). "The *Daubert* factors are: (1) whether the methodology or theory has been or can be tested; (2) whether the methodology or theory has been subjected to peer review and publication; (3) the methodology's error rate and the existence and maintenance of standards controlling the technique's operation; and (4) whether the methodology or technique has gained general acceptance in the relevant scientific community." *Id.* (*citing Daubert*, 509 U.S. at 593-94).

The *Daubert* factors do not provide a "definitive checklist," however, as the *Daubert* inquiry is "fluid and will necessarily vary from case to case." *Amorgianos*, 303 F.3d at 266. A court must ultimately "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). In conducting this analysis, the Court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. The focus of this flexible inquiry is on "the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266 (citing *Daubert*, 509 U.S. at 595).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Kumho Tire*, 526 U.S. at 157. "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). Therefore, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions

reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

On the other hand, if the expert's analysis is not so unfounded as to meet this standard, then gaps, assumptions or inconsistencies properly bear on the weight of the evidence, rather than admissibility. *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

**2. Application**

Plaintiff moves to disqualify or limit the testimony of defendant's expert witness, Dr. Angela Perez, under Rule 702 and *Daubert*. ECF No. 69, 71. The Court concludes that Dr. Perez's extensive experience and education qualifies her to offer her opinions on the toxicological basis behind the development of the Lions Gate COVID-19 safety protocols as they relate to the production of *Raising Kanan*. As Dr. Perez's testimony otherwise satisfies the requirements of Rule 702 and *Daubert*, the motion to disqualify is denied.

Plaintiff first argues that Dr. Perez "lacks the requisite scientific, medical, and subject-matter expertise" to qualify as an expert under Rule 702. ECF No. 69 at 1. The Court disagrees. Dr. Perez holds a Ph.D. in Toxicology from Oregon State University and conducted postdoctoral research in Pharmaceutical Chemistry at the University of California, San Francsico. ECF No. 66 ("Perez Decl.") at 28. She has more than "20 years of professional experience as a toxicologist evaluating chemical

and biological risk in occupational and environmental settings and as a Certified Industrial Hygienist performing exposure assessments for chemical and biological agents." *Id.* at 2. She has published more than 50 articles and abstracts in the areas of toxicology and industrial hygiene. *Id.*, Ex. A.

With respect to COVID-19, since February of 2020, Dr. Perez has "participated in the development of COVID-19 cleaning and disinfection protocols, including working with the Centers for Disease Control and Infection (CDC) to approve cleaning and disinfection plans onboard marine passenger vessels." *Id.* at 2. She has "overseen the implementation of cleaning and disinfection protocols in various other commercial, residential, and industrial locations," "develop[ed] . . . overseen and directed contact tracing procedures at multiple commercial locations," and "overseen COVID-19 testing and coordinated sample collection, analysis, and interpretation of laboratory results." *Id.* at 1-2.

Plaintiff next argues that Dr. Perez's "opinions regarding COVID-19 vaccination, risk mitigation, and related medical considerations are not grounded in recognized scientific consensus or peer-reviewed data." ECF No. 71 at 1. In her report, Dr. Perez stated that she based her opinions "[u]pon [her] review of the factual record and the relevant scientific literature," as well as her "decades of experience working as a toxicologist engaged with environmental hazards and, in particular, the spread of infectious disease." Perez Decl. at 3. In particular, she relied upon "scientific studies published in the peer reviewed literature, facts and data reasonably relied upon by persons in [her] field, [and] publicly available

information published by authoritative governmental agencies such as the CDC or public research institutions (e.g., universities)." *Id.* Plaintiff does not indicate which reports or conclusions she believes are not "grounded in recognized scientific consensus or peer reviewed data," ECF No. 71, but Dr. Perez cites to various reports and policies issued by the CDC, New York Health, and scientific literature published in reputable medical journals to support her claims.

Plaintiff additionally argues that Dr. Perez's testimony relies on "unsubstantiated generalizations rather than specific, verifiable evidence related to Plaintiff Monroque's medical condition or the workplace circumstances of this case." *Id*. at 2. With respect to Plaintiff's medical condition, Dr. Perez's expert report directly replies upon statements that Plaintiff made in her correspondence with Human Resources representatives inquiring about a medical accommodation to the vaccination policy, statements that Plaintiff made in her religious accommodation form, her complaint, and her deposition. *See, e.g.*, Perez Decl. at ¶¶ 5-7. Regarding workplace conditions, Dr. Perez reviewed the COVID-19 protocols that were in place on the set of "Raising Kanan," including the RTWA, LGTV-Starz's Production Safety Guidelines that were adapted and used by the production company, and "contemporaneous guidance by the CDC, the New York State Department of Health (NYDOH), the New York City Department of Health and Mental Hygiene (NYC Health)." *Id*. at ¶¶ 5, 8, 14-32. Therefore, the conclusions in Dr. Perez's report did not rely upon "unsubstantiated generalizations," but instead were based on a comprehensive review of the evidence specific to this case.

Plaintiff also challenges the admission of Dr. Perez's testimony because she had an employment relationship with Lions Gate during the relevant time period. ECF No. 71 at 1. In particular, Plaintiff contends that Dr. Perez's "prior and ongoing relationship" with Lions Gate "renders her effectively a partisan witness." *Id*. at 2.

Prior or current employment with an interested party does not automatically disqualify an expert from rendering expert testimony. *See Int'l Cards Co., Ltd. v. MasterCard Int'l, Inc.,* No. 13-CV-2576 (LGS), 2016 WL 7009016, at *8 (S.D.N.Y. Nov. 29, 2016) ("[T]he mere fact that [an expert] is an employee of a party does not automatically disqualify him from rendering expert testimony."); *Tedone v. H.J. Heinz Co.*, 686 F. Supp. 2d 300, 311 (S.D.N.Y. 2009) (denying plaintiff's motion to exclude an expert's testimony for bias where the expert was employed with defendant for thirty one years); *Knowledge Based Techs., Inc. v. Int'l Bus. Machines Corp.*, No. 96-CV-9461 (JSR), 1998 WL 164791, at *1 (S.D.N.Y. Apr. 8, 1998) ("[C]ourts routinely permit expert testimony by parties, employees, and others with financial and other plain interests in the outcome of the litigation."). Issues of potential bias of an expert "go to the weight, not the admissibility, of his testimony." *Int'l Cards Co.*, 2016 WL 7009016, at *8; *see also Disabled in Action v. City of New York*, 360 F. Supp. 3d 240, 251 (S.D.N.Y. 2019) ("If Defendants believe that [the expert] is biased and that her opinions therefore ought to be disbelieved, they are welcome to marshal that argument when briefing summary judgment.").

Therefore, the Court denies Plaintiff's motion to exclude or otherwise limit

Dr. Perez's testimony under Rule 702 and *Daubert*.

**B. Defendant's Motion for Summary Judgment**

Defendant moves for summary judgment on Plaintiff's claims brought under (1) Title VII of the Civil Rights Act of 1964 ("Title VII"), (2) the Americans with Disabilities Act ("ADA"), (3) the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). The Court considers each claim in turn.

**1. Title VII Claims**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (quoting 42 U.S.C. § 2000e-2(a)(1)). This includes "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" based on a protected characteristic. 42 U.S.C. § 2000e-2(a)(1). Title VII further directs an employer to "reasonably accommodate" an employee's "religious observance or practice," unless such accommodations would impose "undue hardship on the conduct of the employer's business." *Id.* § 2000e(j).

"[The Second Circuit] treat[s] failure-to-accommodate-religion claims in two steps. First, [the court] ask[s] whether the plaintiff has stated a prima facie case of religious discrimination. Second, if so, [the court] determine[s] whether the

employer offered him or her a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship." *Bergin v. New York State Unified Ct Sys*, No. 25-721, 2026 WL 2724974, at *3 (2d. Cir. Sept. 15, 2026) (cleaned up). In order to state a prima facie case of failure to accommodate a religious belief or practice under Title VII, Plaintiff must demonstrate "(1) that she actually required an accommodation of her religious practice, and (2) that the employer's desire to avoid the actually required prospective accommodation was a motivating factor in (3) an adverse employment decision." *Id.* at *5. "If the prima facie case is shown, the burden then shifts to the employer to show it could not accommodate the employees' religious beliefs without undue hardship." *Algarin v. N.Y.C. Health + Hosps. Corp.*, 678 F. Supp. 3d 497, 508 (S.D.N.Y. 2023) (cleaned up).

The Court need not decide whether Plaintiff has made out a *prima facie* case. Assuming *arguendo* that she has, Defendant is nonetheless entitled to summary judgment as it has met its burden of demonstrating that no accommodation could have been granted without undue hardship.

"Title VII does not obligate an employer to grant an accommodation that would cause undue hardship on the conduct of the employer's business." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 368, 370 (2d Cir. 2021) (cleaned up); *see also De Souza v. New York*, 824 F.Supp.3d 336, 354-55 (S.D.N.Y. 2026) ("[Plaintiffs' reasonable-accommodation claim] may be dismissed if the Court finds that her requested accommodations would, as a matter of law, result in undue hardship.").

"The Supreme Court recently clarified that a proposed accommodation constitutes an 'undue hardship' when it poses 'a burden [that] is substantial in the overall context of an employer's business.'" *Russo v. Patchogue-Medford Sch. Dist.*, 129 F.4th 182, 186 (2d. Cir. 2025) (quoting *Groff v. DeJoy*, 600 U.S. 447, 468 (2023)). In determining whether a requested religious accommodation imposes a substantial burden, a court must take "into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Groff*, 600 U.S. at 470-71 (cleaned up). "[A]n accommodation's effect on co-workers may have ramifications for the conduct of the employer's business." *Id.* at 472.

Defendant points out that the essential function of Plaintiff's job as a background actor for the show *Raising Kanan* would have required her to work on camera for prolonged periods of time without a face covering, mask, or other personal protective equipment. ECF No. 65 at ¶ 8. She also would not have been able to maintain six feet of distance from the other cast members or crew while unmasked. *Id.* Plaintiff does not dispute this. *See* Monroque Depo. Tr., 29:24–32:4 (admitting that Plaintiff's role required close unmasked contact with actors and crew). Accommodations such as masking or social distancing, *see* Opp'n at 5, would thus not have been reasonable under these circumstances. *See Devita v. Mount Sinai Hosp.*, No. 22-CV-9826-LTS, 2024 WL 3046121, at *6 (S.D.N.Y. June 18, 2024) ("A reasonable accommodation under Title VII can never involve the

elimination of an essential function of a job, which would necessarily constitute an undue hardship.").

Defendant has likewise established that granting an exemption from the vaccine mandate for a position that required in-person and unmasked interactions with the actors and other Zone A personnel working on the *Raising Kanan* set would have imposed an undue hardship. The required level of contact between Plaintiff and the other members of the cast and crew would have exposed them to serious health risks because unvaccinated individuals are more likely to contract and spread COVID 19. *See* Perez Decl., ¶¶ 34-38, 50. Unrebutted testimony from Dr. Perez establishes that testing alone would not have been sufficient to prevent disease spread, as "[t]esting can only identify infections after the virus has replicated enough to produce detectable levels of viral RNA or antigens, which can take up to several days to reach a detectable level following exposure." Perez Decl., ¶ 33. Accommodations that threaten the health of other employees by heightening their exposure to the COVID-19 virus constitute an undue burden on an employer. *See, e .g.*, *Hall v. Sheppard Pratt Health Sys., Inc.*, 155 F.4th 747, 754 (4th Cir. 2025) ("Hall's refusal to be vaccinated put her fellow coworkers at risk of contracting the virus, as well. Courts have found that, even post-*Groff*, such a safety risk to fellow employees is independently a cognizable undue hardship."); *Peters v. CBS Viacom*, No. 22 Civ. 6287 (VEC) (GWG), 2026 WL 1792761, at *9 (S.D.N.Y. June 23, 2026); *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1136 (C.D. Cal. 2023), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025)

(“Numerous courts have found the possibility of an unvaccinated individual getting others sick to be a non-speculative risk that a court may consider when performing an undue hardship analysis.”). Nothing in Title VII’s mandate requires an employer to accommodate an individual’s religious beliefs by putting the safety of its other employees in jeopardy.

It is further undisputed that a COVID-19 outbreak would have imposed substantial costs on Lions Gate. A shutdown of production and additional days of shooting would have been required if the cast became ill. Def. 56.1 Stmt., ¶ 63. The costs of such additional days of shooting could potentially run into hundreds of thousands of dollars per day. Def. 56.1 Stmt., ¶ 64. Additionally, the unrebutted evidence demonstrates that the “implementation of increased safety measures for unvaccinated workers who would have worked unmasked and in close proximity to others, such as more regular testing and enhanced sanitation, would have added additional time and cost” to the production. Perez Decl., ¶ 49.

In response, Plaintiff argues that Defendant has failed to demonstrate the precise cost to Lions Gate associated with permitting an unvaccinated person to be on set. *See* Monroque Depo. Tr. at 190:17-25. A business need not quantify with precision the cost of permitting unvaccinated employees to work to demonstrate undue burden. *See, e.g.*, *Richardson v. NBA*, No. 23-CV-6926 (DLC), 2025 WL 2402614, at *10 (S.D.N.Y. Aug. 18, 2025) (rejecting Plaintiffs’ argument that Defendant “cannot establish that the accommodation of an unvaccinated [employee] would have caused an undue hardship unless it can quantify the precise risk

associated with permitting unvaccinated referees to work," noting there was "no legal authority imposing this requirement on a business"). Moreover, Plaintiff "offers no [] evidence to dispute that production would have been shut down if she sickened anyone." *Peters*, 2026 WL 1792761, at *9.

For these reasons, Defendant's motion for summary judgment on Plaintiff's Title VII claim is granted.

**2. ADA Claim**

To state a claim for disability discrimination under the ADA, Plaintiff must "demonstrate that she suffered an adverse employment action under circumstances giving rise to an inference of discriminatory intent." *Dooley v. JetBlue Airways Corp.,* 636 F. App'x 16, 21 (2d Cir. 2015) (cleaned up). To establish a prima facie case of discrimination under the ADA, Plaintiff must show that:

> (1) She was disabled or perceived to be disabled within the meaning of the ADA;
>
> (2) Her employer is subject to the ADA and had notice of her disability;
>
> (3) She was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and
>
> (4) She suffered adverse employment action because of her disability.

*McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 101-02 (2d Cir. 2009); *see Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134-35 (2d Cir. 2008) (discussing perceived disability and notice requirement).

Plaintiff's prima facie case fails at the first prong. Plaintiff asserts that Lions Gate terminated her employment because it regarded her as disabled. Opp'n at 5.

The Second Circuit has squarely rejected such a theory of ADA liability, however. In *Sharikov v. Philips Med. Sys. MR, Inc.*, "the issue [was] whether an employee who is discharged for refusing to comply with a company-wide vaccine mandate (that is, who refuses to get vaccinated or to apply for a medical or religious exemption) is protected by the ADA on the theory that he is regarded as being disabled." 103 F.4th 159, 167-68 (2d Cir. 2024). The Second Circuit concluded that such an employee fails to state a claim under the ADA, because that employee has not been "singled out because of any perception that he had an impairment that substantially limited him as compared to others." *Id.* at 168.

Plaintiff alternatively asserts that she was denied a reasonable accommodation. *See* Opp'n at 5. To survive summary judgment for disability discrimination arising from a failure to accommodate, a plaintiff must make a showing of each of the following:

> (1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*McBride*, 583 F.3d at 96-97. "The plaintiff bears the burden of demonstrating that a proposed accommodation exists and permits them to 'perform the job's essential functions.'" *Williams v. NYC Health & Hosps. Corp.*, No. 24-CV-5467 (LJL), 2026 WL 350876, at *3 (S.D.N.Y. Feb. 9, 2026).

Plaintiff's claim again fails at the first prong. She has produced evidence that she has an immunodeficiency thyroid condition, Graves' disease. ECF No. 64-8

at 1. "Having a diagnosed disability does not automatically equate to having a 'disability' as defined under the ADA," however. *Stevens v. City of Oneonta*, No. 21-CV-1258 (MAD) (ML), 2024 WL 3595565, at *13 (N.D.N.Y. July 31, 2024), *aff'd*, No. 24-2334, 2025 WL 1466186 (2d Cir. May 22, 2025); *see also Emanuel v. New York*, No. 08-CV-1250 (RMB) (THK), 2009 WL 4277075, at *5 (S.D.N.Y. Nov. 25, 2009) (holding that plaintiff with Graves' disease did not establish a disability where plaintiff acknowledged that "there are no things that she used to do before the diagnosis [of Graves' Disease] that she cannot do at all [after the diagnosis] and that there are no things that she used to do before the diagnosis that she does now [but only] with difficulty." (cleaned up)).

Rather, the ADA defines a disability as a "physical or mental impairment that substantially limits one or more major life activities" of an individual. 42 U.S.C. § 12102(1)(A). Major life activities include, but are not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). An impairment "substantially limits a major life activity if the impaired person is significantly restricted as to the condition, manner or duration under which she can perform the activity." *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 68 (2d Cir. 2014) (cleaned up); *see also Marshall v. Westchester Med. Ctr. Health Network*, No. 22-CV-7990 (NSR), 2024 WL 665200, at *10 (S.D.N.Y. Feb. 16, 2024) ("Merely having an

impairment that *affects* a major life activity does not make one disabled for purposes of the ADA.").

Plaintiff has not adduced evidence suggesting that her Graves' disease substantially limited any of her major life activities. According to her deposition, Plaintiff was diagnosed with Graves' disease in late 2007. *See* Monroque Depo. Tr. at 57:10-12. At the onset of her illness she experienced mobility loss, but she has been in remission from 2008 to 2023. *Id.* at 60:8-16. Since her remission, she has "not had to do any other thing except maintain [her] diet to control [her thyrotropin] levels." *Id.* at 60:16-24. And during her deposition, Plaintiff denied that her condition impacted her ability to work. *See id.* at 62:16–63:23.

Yet that does not end the Court's analysis. At least one court has held that heightened risk of an adverse reaction to the COVID-19 vaccine due to an underlying medical condition qualifies as a disability under the ADA. *See Carnett v. TIAA Ins. Co.*, No. 24-CV-9991 (JPO), 2026 WL 35348, at *5 (S.D.N.Y. Jan. 6, 2026). Plaintiff has produced a report from her current nurse practitioner, who opines that Plaintiff's refusal to receive the COVID-19 vaccination in 2023 was "clinically understandable given the evolving knowledge base at the time and her personal risk profile, [as] [p]atients with autoimmune conditions, including those with Graves' disease, may justifiably approach new immune-modulating therapies with caution." ECF No. 64-8 at 1. The nurse practitioner further states that "[e]merging literature has reported cases of Graves' disease recurrence or new onset following mRNA COVID-19 vaccination, suggesting a possible link in susceptible

individuals." *Id.* The nurse practitioner admits, however, that these "reports do not prove causality" between vaccination and disease recurrence. *Id.* at 2.

This evidence is at best weakly probative on the issue of whether Plaintiff has a higher risk of an adverse reaction to COVID-19 vaccination than the general population. If anything, it speaks more to the reasonableness of Plaintiff's concerns than to any definitive medical evidence that Plaintiff has a disability. And it is undisputed that Plaintiff's treating physician recommended that she be vaccinated against COVID-19, and that he did not advise her it would be unsafe because of her Graves' disease. Def. 56.1 Stmt., ¶¶ 70-71. It is similarly undisputed that medical literature supported by clinical studies establishes that neither the Pfizer nor the Moderna vaccines were contraindicated for Graves' disease. *Id.*, ¶ 69. In the face of this undisputed evidence, Plaintiff has not established that there is a genuine issue of fact as to whether she has a qualifying disability.

Plaintiff's ADA claim fails for the additional reason that she refused to provide any documentation in support of her request for a medical accommodation when this information was requested by Lions Gate. "[T]he ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *McBride*, 583 F.3d at 99. An employer cannot be said to deny a request for an accommodation where the employer is not sufficiently on notice of the nature of the disability or what types of accommodations might permit an individual to perform essential job functions. Accordingly, an employer is entitled to request information from an

employee as part of that interactive process. "[W]here an employee fails to provide documentation sufficient to allow an employer to assess the parameters of the employee's disability, 'ADA liability simply does not follow.'" *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 579 (S.D.N.Y. 2008) (quoting *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996)); *see also Jackson v. Elmhurst Hosp. Ctr.*, No. 10-CV-5248 (RRM) (RER), 2012 WL 868965, at *6 (E.D.N.Y. Mar. 14, 2012).

It is undisputed that Plaintiff did not present any medical evidence to Defendant prior to her termination to substantiate the nature of her medical condition or her need for a medical accommodation, even after Defendant requested such information. Plaintiff's refusal to engage in the interactive process precludes relief under the ADA.

Finally, Plaintiff's reasonable accommodation claim fails for the additional reason that she failed to show that a reasonable accommodation existed that would allow her to perform her essential job functions. At summary judgment, "the plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment." *McBride*, 583 F.3d at 97. As discussed *supra*, it is undisputed that the essential functions of a background actor required that she work in person, unmasked, and in proximity to the production's cast and crew. Thus, Plaintiff's proposals of masking and social distancing do not constitute reasonable accommodations under the ADA.

For all these reasons, Defendant's motion for summary judgment on Plaintiff's ADA claim is granted.

**3. State Law Claims**

The Court has dismissed all claims presenting a federal question, leaving only Plaintiff's state law claims. It is unclear whether the Court has original jurisdiction over those state law claims pursuant to 28 U.S.C. § 1332(a)(1). Section 1332 provides for diversity jurisdiction over civil actions where the parties are citizens of different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. While the parties here are citizens of different states, *see* Am. Compl. at 2, no amount in controversy is specified. "Where no amount is specified, this fact alone does not bar a finding that the jurisdictional amount has been met. In such cases, courts examine the nature of the claims, factual allegations within the pleadings, and the record outside the pleadings to determine the amount in controversy." *Burr ex rel. Burr v. Toyota Motor Credit Co.*, 478 F. Supp. 2d 432, 438 (2d. Cir. 2006). Here, the Court does not have enough information to find that Plaintiff's loss of income as background actor, or any other species of damages, would have equaled or exceeded the $75,000 threshold.

Ultimately, however, the Court need not resolve this question. Even assuming the Court did not have original jurisdiction over the state law claims, the Court nonetheless would exercise its discretion to retain supplemental jurisdiction over any pendent state law claims. *See* 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to

be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). However, where, as here, the state law claims and the federal claims share a common factual nucleus, the parties have already completed discovery and summary judgment briefing, and the state law claims are susceptible of resolution on substantially the same grounds as the federal claims, judicial economy, convenience, and fairness to the parties weigh in favor of the Court's exercise of supplemental jurisdiction. *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 413 (S.D.N.Y. 2014).

Under the NYSHRL and the NYCHRL, "it is an unlawful employment practice for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 242 (S.D.N.Y. 2021) (cleaned up). The NYSHRL and NYCHRL both recognize undue hardship as an affirmative defense. An "undue hardship" is defined in both the NYSHRL and NYCHRL as an "accommodation requiring significant expense or difficulty" including "significant interference with the safe or efficient operation of the workplace." N.Y. Exec. L. § 296(10)(d)(1); N.Y.C. Code § 8-107(3)(b). The standards applicable to an undue hardship defense under the NYSHRL and the NYCHRL are therefore substantially the same as the standards applicable to a parallel Title VII claim. *See De Souza*,

824 F. Supp. 3d at 373-74. Plaintiff's failure-to-accommodate claims arising under the NYSHRL and NYCHRL fail for the same reason as her Title VII claim.

Plaintiff's disability discrimination claim under the NYSHRL and NYCHRL fares no better. "In order to make out a prima facie case of failure to accommodate [under the NYSHRL and NYCHRL], the plaintiff must show that (1) she was disabled as defined by the statutes; (2) her employers had notice of the disability; (3) with reasonable accommodation, she could perform the essential functions of her job, and (4) the defendants refused to make reasonable accommodations for her needs." *Vangas v. Montefiore Med. Ctr.*, 6 F. Supp. 3d 400, 412 (S.D.N.Y. 2014).

Both the state and city statutes contemplate an interactive process with respect to an accommodation request. *See Jacobsen v. NYC Health & Hosps. Corp.*, 22 N.Y.3d 824, 838 (2014). As part of such process, an employer can request medical documentation to support an accommodation request. *See* 9 N.Y.C.R.R. § 466.11(j)(5) ("Once an accommodation is under consideration, the employer has the right to medical or other information that is necessary to verify the existence of the disability or that is necessary for consideration of the accommodation."). "Under both the NYSHRL and the NYCHRL, both the employer and the employee have a duty to engage in a good-faith dialogue once the interactive process begins, and '[a]n employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate.'" *Alvarez v. New York City Transit Auth.*, 215 N.Y.S.3d 522, 524-25 (2d Dep't 2024).

As discussed above, Plaintiff did not inform Lions Gate that she had Graves' disease at the time she sought employment on the set of *Raising Kanan*. She referred vaguely to an "autoimmune" condition and submitted screenshots of thyroid tests, *see* ECF 65-1 at 2-6, but offered no explanation as to why her condition required a vaccine exemption. When Lions Gate requested that she provide documentation from her treating physician, she declined to do so. She provided Lions Gate with no information as to the nature of her disability, or why a vaccine exemption would be a reasonable accommodation for her condition. Thus, Plaintiff cannot demonstrate that she sufficiently put Defendant on notice of her need for a medical accommodation or that she participated in the required interactive process.

Additionally, although the definition of disability is broader under the NYSHRL and NYCHRL than under the ADA, *see Arazi v. Cohen Bros. Realty Corp.*, No. 20-CV-8837 (GHW), 2022 WL 912940, at *10 (S.D.N.Y. Mar. 28, 2022), a plaintiff cannot proceed with a failure-to-accommodate claim unless the requested accommodation is necessary to allow the individual to perform her job in light of the qualifying disability. *See Goolsby v. City of New York*, 229 N.Y.S.3d 131, 132 (1st Dep't 2025) (dismissing NYSHRL claim where "plaintiff failed to demonstrate a nexus between the alleged disability (Wolff–Parkinson–White Syndrome) and the need for an exemption from the vaccination mandate, as documentary evidence established that the resultant risk of arrhythmia was not a contraindication to vaccination or an approved basis for a temporary medical exemption therefrom").

The undisputed record evidence establishes that the COVID-19 vaccine was not contraindicated for individuals with Graves' disease. There was thus no connection between Plaintiff's disability and her requested accommodation.

## CONCLUSION

Accordingly, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment for Defendant on all claims, to terminate ECF Nos. 62, 69 and 71 and all pending motions, and to close the case.

SO ORDERED.

Dated: September 30, 2026
New York, New York

JEANNETTE A. VARGAS
United States District Judge